

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | | |
|---|---|---|
| MARLENE ROJICEK, | ) | |
| Plaintiff, | ) ) | No.: **01C 0723** |
| | ) | |
| v. | ) | Judge: |
| | ) | |
| RIVER TRAILS SCHOOL DISTRICT 26; | ) | **JURY DEMAND** JUDGE ZAGEL |
| SHIRLEY SMALLEY, individually and in | ) | |
| her official capacity; DONALD KELLEN, | ) | MAGISTRATE JUDGE DENLOW |
| individually and in his official capacity; | ) | |
| JOHN REPSHOLDT, individually and in his | ) | |
| official capacity; WILLIAM J. WHEATLEY, | ) | |
| individually and in his official capacity; | ) | |
| ALICE JENKS, individually and in her | ) | **DOCKETED** |
| official capacity; NANCY MCCULLY, | ) | |
| individually and in her official capacity; | ) | FEB - 5 2001 |
| JAMES CULLEN, individually and in his | ) | |
| official capacity; ALVIN ENGBERG, | ) | |
| individually and in his official capacity; | ) | |
| JAMES MEYER, individually and in his | ) | |
| official capacity; and DONALD SERBIN, | ) | |
| individually and in his official capacity, | ) | |
| | ) | |
| Defendants. | ) | |

01 FEB -2 AM 10: 13    CLERK U.S DISTRICT COURT    FILED-ED4

## COMPLAINT

**NOW COMES** the Plaintiff, Marlene Rojicek, by and through her attorneys, Claudia Oney and Patricia Rummer, and complaining of Defendants, states as follows:

### Jurisdiction

1.  This action arises under provisions of 42 U.S.C. § 1983, 42 U.S.C. § 1985, and 42 U.S.C. § 1988, to redress unlawful employment practices and violations of Plaintiff's civil rights as engaged in by Defendants. Pendent claims arising under state law are also part of this action. Declaratory, injunctive and equitable relief are sought pursuant to 28 U.S.C. §§ 2201 and 2202, and 42 U.S.C. § 1988.

2.   Jurisdiction is specifically conferred upon this Court under 42 U.S.C. § 1983 and 28 U.S.C. § 2353(4).   Costs and attorneys' fees are sought pursuant to 42 U.S.C. § 1988 and Rule 54(d) of the Federal Rules of Civil Procedure.

### Venue

3.   Venue is proper in this District and Division under 28 U.S.C. §§ 1343, 2201 and 2202 in that the events complained of herein took place in this District.

### Parties

4.   The Plaintiff, Marlene Rojicek, is a citizen of the United States who is domiciled in the State of Illinois.

5.   The Defendant, River Trails School District 26, is a body politic and corporate licensed to do business in the State of Illinois.

6.   Upon information and belief, the Defendant Shirley Smalley is a citizen of the United States who is domiciled in the State of Illinois.   At all times relevant hereto, Smalley was Superintendent of River Trails School District 26.

7.   Upon information and belief, the Defendant Donald Kellen is a citizen of the United States who is domiciled in the State of Illinois.   At all times relevant hereto, Kellen was Assistant Superintendent of River Trails School District 26.

8.   Upon information and belief, the Defendant John Repsholdt is a citizen of the United States who is domiciled in the State of Illinois.   At all times relevant hereto, Repsholdt was Director of Business Services for River Trails School District 26.

9.   Upon information and belief, William J. Wheatley is a citizen of the United States who is  domiciled in the State of Illinois.   At all times relevant hereto, Wheatley was President of River Trails School District 26.

10.   Upon information and belief, the Defendant Alice Jenks is a citizen of the United States who is domiciled in the State of Illinois.   At all times relevant hereto, Jenks was Vice President of River Trails School District 26.

11.  Upon information and belief, the Defendant Nancy McCully is a citizen of the United States who is domiciled in the State of Illinois.  At all times relevant hereto, McCully was Secretary of River Trails School District 26.

12.  Upon information and belief, the Defendant James Cullen is a citizen of the United States who is domiciled in the State of Illinois.  At all times relevant hereto, Cullen was a member of the board of River Trails School District 26.

13.  Upon information and belief, the Defendant Alvin Engberg is a citizen of the United States who is domiciled in the State of Illinois.  At all times relevant hereto, Engberg was a member of the board of River Trails School District 26.

14.  Upon information and belief, the Defendant James Meyer is a citizen of the United States who is domiciled in the State of Illinois.  At all times relevant hereto, Meyer was a member of the board of River Trails School District 26.

15.  Upon information and belief, the Defendant Donald Serbin is a citizen of the United States who is domiciled in the State of Illinois.  At all times relevant hereto, Serbin was a member of the board of River Trails School District 26.

**Facts Common To All Counts**

16.  Rojicek was hired by District 26 as Administrative Assistant–Payroll on or about July 27, 1997.

17.  At all times relevant hereto, Rojicek performed her duties in an exemplary manner. Her competence and attitude earned her frequent expressions of gratitude from employees of District 26 for the efficient and helpful way in which she administered the payroll function.  One veteran teacher informed Rojicek she was the best payroll accountant the district had in 30 years.

18.  Both Defendant Smalley and Defendant Repsholdt told Rojicek on more than one occasion that she was performing her duties well.   Repsholdt, Rojicek's immediate supervisor, gave her an oral review in which he told her she was doing an excellent job and to keep up the good work.

19.  These job performance appraisals were in keeping with the review of Rojicek's performance conducted by Repsholdt's predecessor, Raelynn Roman, who gave Rojicek an outstanding written review.  Roman informed others within District 26 that she considered Rojicek "absolutely brilliant"–a view echoed by Repsholdt who described Rojicek to at least one other individual as "extremely intelligent" and "probably the most intelligent person I have ever known."

20.  The performance appraisals Rojicek received at District 26 were similar to those she received from previous employers, including East Maine District 63.  Said performance appraisals are part of Rojicek's personnel file maintained by District 26.

21.  Rojicek also received a bonus recommendation from Community Consolidated School District # 15 for outstanding work performance when she worked there–the first time a payroll assistant had ever received a bonus recommendation.  According to the then-treasurer of District 15, Rojicek's performance and abilities were "head and shoulders" above those of the four payroll accountants he had also worked with.

22.  Additionally, Smalley wrote Rojicek a personal note praising her ability to process the payroll in a timely and accurate fashion, handle crises and adapt to changes quickly and competently.

23.  Rojicek also received a letter of commendation on behalf of the Board of District 26 for the professionalism she demonstrated in a difficult situation when the Mount Prospect Bank failed to transfer funds for a September 1999 payroll to the Federal Reserve on October 8, 1999.

24.  Smalley later delegated the supervision of the payroll function to Repsholdt, although she knew he was not qualified to exercise such oversight.   Specifically, he was less qualified than Rojicek to execute payroll functions competently.  Although a CPA, Repsholdt had no practical experience or interest in general accounting functions, including payroll.  Rojicek, on the other hand, has extensive experience as general accounting manager for major corporations and possesses the necessary discipline for detail-intensive positions, such as payroll.  At all times relevant hereto, Repsholdt was responsible for supervision of the payroll function.

25. In fact, at the time Repsholdt was assigned to oversee the payroll function, he had been unable to complete a simple billing project assigned to him even though he had been working on it for more than eight months.   Moreover, Repsholdt billed transportation charges incorrectly as part of the project.

26. Repsholdt hired Rojicek to work on her own time doing research for his Type 75 certificate. One of the projects which Rojicek performed for Repsholdt was analyzing the District's financial statements for trends that would be valuable in budgeting and forecasting. Another assignment which Repsholdt hired Rojicek to do for him was to identify items usually found in negotiated teacher agreements.   Repsholdt received an A in both courses.

27. Additionally, Repsholdt relied on Rojicek's ability to immediately and thoroughly grasp new information by enlisting her assistance in helping him cram for final examinations in those and other courses.

28. As Administrative Assistant–Payroll, Rojicek was a member of the District's Educational Support Personnel (ESP).

29. In or around June, 1998, Smalley informed the ESP staff that they would be receiving a raise of 1.7% raise.   The small size of the increase was unwarranted and unreasonable.   Nonetheless, the Board approved the minuscule raise despite the lack of a current teacher's contract at the time.

30. Upon information and belief, Smalley and the Board knowingly exploited and underpaid the non-certified staff (i.e., the ESP staff) by consistently approving seriously inadequate percentage increases each year.  Upon information and belief, the objective of Smalley and the Board in so doing was to intimidate the certified staff (i.e., the teachers) who were currently in salary negotiations.

31. To illustrate the plight of the ESP staff who would have to live on the raise of 1.7%, Rojicek told Smalley that the 1.7% increase would allow her (Rojicek) to go to bargain matinee alone once a week, but once there, she would have to decide whether to have a coke or a small box of popcorn because she wouldn't be able to afford both.  She also pointed out that most of

the other ESP staff would not even be able to afford that small luxury. Rojicek made this comment to Smalley at a meeting in June, 1998 attended by all central office personnel.

32.   Smalley was so angered by Rojicek's comments about the inadequacy of the raise for the ESP employees that she threatened then and there to eliminate Rojicek's position–the only administrative assistant position threatened with elimination by Smalley.

33.   In response, Rojicek informed Smalley that elimination of the payroll position through outsourcing was financially unsound and ridiculous–the district would spend more money for outsourcing–that school payrolls had complexities and details which are not amenable to outsourcing. Rojicek also pointed out to Smalley that the personal attention to employees would also be forfeited. Rojicek also expressed her view that there probably wasn't another school district anywhere that outsourced payroll.

34.   Both Kellen and Repsholdt were present at the meeting and agreed with Rojicek's response to Smalley's intentional effort to intimidate Rojicek.

35.   Upon information and belief, Smalley, Kellen, Repsholdt and members of the Board have sufficient business acumen to recognize the accuracy of Rojicek's statements concerning the fact that outsourcing of the payroll functions is not a viable option for school districts.

36.   The "coke versus popcorn" choice became a battle cry for the educational support personnel, as the minuscule raise which Smalley and the District limited them to drove them to unionize.

37.   Beginning in or around July 1998, Rojicek actively worked to form a union for the educational support personnel. Previous attempts to unionize the ESP staff had been unsuccessful, but with Rojicek's efforts, in the climate the District and Smalley had created, unionization finally succeeded. The widespread discontent over the paltry salary increase decided upon by Defendants was the back-breaking straw.

38.   The perception widely held by ESP staff that Smalley used tax dollars to reward those she considered loyal to her personally, and that she was vindictive and retaliatory toward those employees whom she did not consider loyal also contributed to unionization.

39.  Rojicek's contribution to the unionization effort included supplying names, mailing addresses and job descriptions of eligible employees to the president of the teachers' union; passing out and collecting interest cards, vocally supporting the formation of the union to other employees, attending all preliminary meetings, fighting her exclusion from union representation, addressing the concerns of ambivalent employees about the benefits of union representation, and getting out the vote.

40.  Rojicek also informed both Repsholdt and Kellen of her union activities and her interest in a visible leadership position in the union.  Rojicek advised them that she clearly saw the need for the union, and that she wanted to use management skills she had gained in the private sector to assure the success of the union.

41.  Upon information and belief, Repsholdt passed this information on to Smalley immediately.  Smalley knew of Rojicek's active role in the formation of a union for ESP staff in July, 1998 when the ESP employees were just beginning to consider one.

42.  At the time the union was being formed, administrators of District 26, including Smalley, attempted to exclude seven or eight job positions from the bargaining unit, including Rojicek's position.

43.  Rojicek protested the denial of union representation for herself and joined others in their fight not to be excluded.  Despite pressure from Smalley, who tried to convince ESP staff that unionization would hurt and not help employees, Rojicek held out for inclusion.  Rojicek's position was the last one to be excluded when Rojicek and two other remaining employees complained to the Labor Relations Board about the efforts of Smalley and District 26 to deny union representation to employees who held the positions that Smalley and District 26 sought to bar from the union.

44.  Upon information and belief, the exclusion of Rojicek's position had little to do with the requirements of the payroll position.  Instead, Rojicek's position was excluded due to her general accounting expertise and ability to fill in for other positions.

45. When the bookkeeper for District 26, Kathy Sanders, was absent for approximately three months because of a serious illness, Rojicek, although new to the district, assumed Sanders' job responsibilities as well as her own and did an exemplary job in both positions. The bookkeeper position had access to confidential information (i.e., received revenues) that could be supplied to union representatives for negotiation purposes. Such knowledge would preclude union representation.

46. Since only the payroll position and not the bookkeeper position was eliminated by outsourcing, Rojicek was illegally denied union representation. The district's outsourcing of payroll clearly demonstrates that the abilities of Rojicek should not have been considered in the inclusion/exclusion of the payroll position from union representation since Rojicek's position was excluded solely due to her ability to handle the bookkeeper position.

47. At all times relevant hereto, Rojicek was the only educational support employee capable of filling the position of the bookkeeper for the district.

48. Shortly after the ESP staff voted to unionize, the Board of District 26 voted to give key administrators not already on early retirement incentive, as well as some non-union support personnel, a generous pay raise (in salary and/or paid benefits) during mediation with the unionized support staff.

49. The pay raise amounted to 12% in some, if not most, cases, and may have been even greater for some employees.

50. Immediately prior to the bestowing of these significant compensation increases, Rojicek did a salary survey of the salaries of principals in other area school districts. Prior to the generous pay jumps referenced above, the salaries of the District's principals were in line with the salaries of principals in other districts, even when pension contributions paid by various districts on behalf of employees were factored in.

51. Upon information and belief, Smalley and the Board tapped the proceeds of a successful bond referendum and took advantage of the five percent cap on Education Fund expenditures to bestow the unwarranted raises. Prior to the compensation increases, the Board

had ample funds, and Smalley and the Board chose to share a significant portion of them with a small coterie of allies rather than a more equitable distribution of funds for compensation.

52. These generous compensation increases for a select few occurred at the same time that Smalley and the Board were attempting to limit the ESP union staff to a paltry 1.5 percent salary increase and attempting to take away benefits already in place for them, including sick/vacation days, early retirement incentives and other benefits.

53. A hearing on Rojicek's protest was held by the Labor Relations Board in or around March, 1999.

54. Upon information and belief, the Board was aware of Smalley's contempt for the union and the union organizers as repeatedly demonstrated by her refusal to compromise, her practice of canceling negotiation meetings at the last minute, and forcing matters to arbitration.

55. Upon information and belief, the progress of ESP staff union negotiations were discussed in closed sessions by the Board.

56. Upon information and belief, the Board of District 26 knew of Rojicek's activism on behalf of the union for educational support personnel when the Board terminated Rojicek.

57. Union members waited two full years for a salary increase. Smalley was unsuccessful in preventing the increase from being retroactive, although she tried vigorously to do so. Upon information and belief, salary increases for District 26 employees were always retroactive.

58. Up to and including March, 2000, members of the community publicly addressed the Board to criticize the lack of a settlement for ESP union members.

59. Up to and including March, 2000, individuals in the community at large publicly challenged the Board to justify the size of Smalley's salary.

60. In March, 2000, Rojicek viewed the Board in action at a public meeting. She observed that taxpayers who addressed the Board were basically ignored.

61. Upon information and belief, one of the attorneys representing the District in negotiations for the ESP staff queried various employees of the District as to Smalley's sanity.

62.   Despite their awareness that Smalley was a problematic superintendent who had obtained her position through default, the Board failed to adequately supervise Smalley.

63.   Kellen refused a request by the Board to postpone his retirement.  Upon information and belief, he did so because he was no longer willing to work for Smalley.

64.   Upon information and belief, the Board is aware that Repsholdt is planning to leave his employment with the District during the current fiscal year ending June 30, 2001. Repsholdt has stated to others that he is leaving because of his unwillingness to continue working under Smalley's regime.

65.   Despite its awareness of Smalley's repressive, union-busting style of management, the Board has consistently refused to take action to prevent Smalley's illegal conduct.

66.   The new union, which was certified in or around May, 1999, became a branch of the union representing teachers in District 26.

67.   Smalley viewed the union as a black mark on her record as Superintendent.

68.   Although Smalley pledged that she would not retaliate against any employee who had been involved in the formation of the union, in or around late October of 1999, Smalley sought to discipline Rojicek for "talking to the union."

69.   The event which prompted Smalley's retaliation was Rojicek's request of Kandi G'Francisco, president of the union, for a list of enrollees in the union so that she (Rojicek) could make payroll deductions for the first payroll in November.  After Rojicek asked for the list, Smalley called her in for a disciplinary meeting at which Repsholdt was also present.   When Smalley reprimanded Rojicek, she was aware that interfering with Rojicek's communication with union representatives made Rojicek's job more difficult and increased the possibility of errors.

70.  On other occasions, Smalley reprimanded Rojicek for providing too much information to the union and for actively encouraging new employees to join the union.

71.   Smalley also warned Rojicek not to mention the union to new employees.

72. Smalley's last reprimand to Rojicek concerning the union occurred in or around January, 2000 when Smalley overheard Rojicek's conversation with the administrative assistant to the curriculum director. Rojicek was advising the employee, whose position was covered by the union, to investigate joining the union due to the problems she was having with her director.

73. Smalley also retaliated against Rojicek for her involvement in forming the union and for protesting the exclusion of employees from union representation, by failing to honor earlier promises she had made to increase Rojicek's salary. The commitment to increase Rojicek's salary was finally forced on Smalley during the hearing before the Labor Relations Board in March, 1999. This increase represented an increase/bonus that Smalley had promised Rojicek over a year earlier and was in recognition of both Rojicek's abilities in payroll and her prior performance of Sanders' job during Sanders' illness.

74. On or about the following day, Repsholdt told Rojicek that Smalley was "really angry" at Rojicek for using the Labor Relations Board hearing to figuratively arm wrestle Smalley into honoring her commitment. He also told Rojicek that she was smart to seize the opportunity the way she did given Smalley's contempt for Rojicek resulting from her union activism.

75. Kellen still laughingly remembered the incident nearly a year later.

76. Upon information and belief, Rojicek's eventual salary increase was less than forty percent of what Repsholdt had recommended for Rojicek. It did not become effective until July 1, 1999.

77. The salary schedule effective July 1, 1999 for non-union ESP staff prepared for the Board had to be revised because Smalley originally sought to obtain Board approval for the minimum increase of 2.55 percent for Rojicek.

78. Upon information and belief, Smalley's string of broken promises to Rojicek concerning a salary increase came to an end when Smalley realized that there were too many witnesses to the public salary increase commitment she made to Rojicek before the Labor Relations Board.

79.   Given Smalley's detail-oriented approach to her position, it is unlikely that she forgot her promises to increase Rojicek's salary.

80.   Upon information and belief, Smalley directly blamed Rojicek for the formation of the union for education support personnel.  Both Repsholdt and Defendant Kellen advised Rojicek that Smalley blamed her for the existence of the union for ESP employees.

81.   On or about January 2000, Repsholdt had discussion with Rojicek and Sanders.  The conversation took place because of Sanders' ongoing dissatisfaction with her salary and with Smalley's continuing practice of giving Sanders' minimal salary increases despite her excellent performance.  Despite her excellent performance, Sanders received the minimum increase of 2.55% effective July 1, 1999.

82.   During this conversation, Repsholdt advised both Rojicek and Sanders to get other job offers at higher salaries and use those offers to force Smalley into giving them the compensation he felt they deserved.

83.   Upon information and belief, Sanders and Rojicek were punished with undeservedly low salary increases because they were perceived by Smalley as being instrumental in the formation of the union for education support personnel.

84.   Other key administrative personnel who did not agitate for the formation of a union for education support personnel, were given much larger salary increases, even though the performance of Rojicek and Sanders was equal to or better than that of employees who got significantly larger increases.

85.   In late 1999, Smalley advised her subordinates that she was postponing her retirement for two years despite the fact that she had received an early retirement incentive from District 26.  Sanders expressed concern to Kellen that Smalley should return her early retirement incentive, but Kellen advised Sanders, in Rojicek's presence, that Smalley was going to keep the incentive payment.

86.   On an earlier occasion, Kellen had approached Rojicek for her input regarding the low morale and anger among district employees caused by the 1.7% increase.  On that occasion,

Kellen also asked Rojicek whether she thought the unionization effort for the educational support personnel would succeed.

87.  On several occasions, Smalley stated to Rojicek that she didn't care how many times this district [District 26] was sued.

88.  Smalley freely acknowledged to Rojicek that she had a history of being the target of numerous grievances brought by employees of other districts where she had worked.

89.  Upon information and belief, the other Defendants were aware of Smalley's problematic career history when they hired her.

90.  In fact, Repsholdt advised Rojicek to avoid talking with Defendant Smalley directly because of Smalley's tendency to react angrily in almost every encounter.  Repsholdt advised Rojicek that Smalley was angry with Rojicek and Kathy Sanders, another ESP employee, because she viewed them as instigators in the formation of the union for educational support personnel.

91.  Kellen also advised Rojicek two weeks before she was fired that Smalley blamed Rojicek for the union and that she would continue to blame Rojicek for the union rather than take responsibility for the conditions which led to the formation of the union.

92.  In mid-February, 2000, Rojicek realized that she had made a payroll error which resulted in Smalley being overpaid since July, 1999.

93.  Smalley did not call the error to Rojicek's attention even though she presumably had knowledge of the error prior to the first payment of the fiscal year on July 2, 1999.  The error could have been avoided had Smalley spoken up at that time.

94.  Moreover, although it was not the usual practice at District 26, Rojicek prepared an Excel spreadsheet of Smalley's gross earnings through net pay by pay period for the upcoming fiscal year.  Rojicek prepared the spreadsheet to assist Smalley in deciding what tax withholding changes to make and so that Smalley could see the effect that her 20% early retirement stipend would have on her biweekly take-home pay.  Rojicek prepared a similar spreadsheet of Kellen's

salary for Kellen's benefit since Kellen had also opted to take advantage of the retirement incentive.

95.   The spreadsheet clearly indicated Smalley's gross earnings, including District 26's contribution for Smalley to the Teacher Retirement System, as well as her stipends.  Smalley could readily see the error from this spreadsheet.

96.   Smalley did use this spreadsheet to change the amount of federal income taxes withheld from her checks, that is, a flat 31%.

97.   Despite the fact that Smalley could have readily determined the error from reviewing the spreadsheet, she did not advise Rojicek of the error.  Rojicek discovered it in checking new payroll information resulting from Smalley's changing her retirement date from two years in the future to four years in the future.

98.   Smalley, Kellen and Repsholdt were aware that the error in Smalley's check did not reflect in any way on Rojicek's ability to process payroll.   They were also aware that this error was made during the payroll which happened to be the first in which the department was converting to direct deposit of employee paychecks for the first time.

99.   The direct deposit proved to be a payroll crisis because Repsholdt had failed to obtain the information needed for the direct deposit.  One teacher returned a form which Repsholdt had prepared, without Rojicek's review, with a grade of "D" and with all Repsholdt's errors circled.

100.   Smalley, with Board approval, failed to return her retirement stipend when she backed out of her agreement with District 26 to retire.   The net effect of keeping the 20% retirement stipend was to increase her retirement pension and increase her income two years ahead of time.

101.   The Board had approved Smalley's early retirement stipend despite the fact that Smalley did not have the ten years of employment required of other employees in the district to qualify for a retirement stipend.

102.  In fact, the Board approved this stipend, which amounted to a 20% increase in salary for each of two years although Smalley only had four years' service credit.

103.  Rojicek prepared a spreadsheet which showed what had been paid to Smalley and what should have been paid.  She also provided several scenarios in which Smalley could repay the overpaid salary.

104.  Rojicek discussed the matter with Repsholdt, who advised her that, considering Smalley's tendency to erupt in rages where Rojicek was concerned, it would be advisable for Repsholdt to bring the matter to Smalley's attention.  Rojicek agreed.

105.  For example, Smalley erupted in a rage when Rojicek questioned a practice that violated Board policy regarding overtime during a week that included an unpaid nonattendance day–Board policy that Smalley deliberately ignored.

106.  The incident leading up to Rojicek's questioning also resulted in Smalley's payment of additional sums to various principals.  Rojicek believed that this policy was against Board policy, as did Repsholdt.  Repsholdt expressed outrage that salaried personnel were being paid the exorbitant sum of approximately $400 each for doing simple clerical work on a Saturday morning.

107.  Despite his concerns, Repsholdt did not approach Smalley about this incident since he wanted to avoid an outburst similar to the one Smalley made the previous workday.  During this tirade, Smalley screamed, "Who does Rojicek think she is, the boss?"  Rojicek's job responsibilities required that she question payments that seemed untoward.  Repsholdt stated that he had never seen Smalley as mad as she was that day.

108.  Smalley also refused to correct an error originally made at the beginning of the July 1, 1997 fiscal year which resulted in all 12-month non-certified personnel who did not terminate before the beginning of the July 1, 1998 fiscal year losing one day's pay.  Rojicek's predecessor in payroll made this error.  Smalley's refusal to make the necessary adjustment violated Board policy.

109. Repsholdt subsequently advised Rojicek that Smalley was "really angry" with Rojicek, and that this was the second time that Rojicek had screwed up her paycheck. After Rojicek told Repsholdt that Smalley's statement was untrue, Repsholdt suddenly remembered that another employee had been responsible for a previous error on Smalley's paycheck.

110. Upon information and belief, the error in Smalley's payroll discovered in February 2000 was the only error by Rojicek that Smalley knew about, despite Rojicek being employed 30 months with District 26. The error provided a pretext for Smalley to finally rid herself of Rojicek, as she had publicly threatened in June 1998. Rojicek was terminated a few weeks later.

111. Upon information and belief, and despite an extensive search for errors by Kellen and Repsholdt, no other errors by Rojicek affecting the accuracy of any paycheck were found prior to Rojicek's termination, although said search turned up errors by other personnel. Rojicek, Sanders and Kathy Beck were also involved in this search for errors.

112. Repsholdt involved Sanders and Rojicek only because he could not understand computer printouts of the final two December 1999 payrolls. Repsholdt erroneously thought one of the payrolls had been duplicated. .

113. Upon information and belief, employees of District 26 conducted an even more extensive search for errors after Rojicek was terminated and no longer on the premises. Upon information and belief, Repsholdt also went to NDI Solutions, Inc. with payroll printouts in a futile attempt to find any payroll processing errors that would justify outsourcing after Rojicek was terminated and no longer on the premises.

114. Upon information and belief, Smalley did not order a search of payroll records when Rojicek's predecessor, Mary Baptist, made payroll errors, despite Baptist having a history of making more errors than Rojicek. Upon information and belief, the only search of payroll records ordered by Smalley during Baptist's tenure occurred after Baptist complained to the Labor Board about Smalley's intentional violation of the district's overtime policy.

115. On or around February 22, 2000, Repsholdt advised Rojicek that Smalley had asked him to write up Rojicek, but that he intended to ignore Smalley's request to write up Rojicek since he considered the request ridiculous. Kellen also considered Smalley's request for a write-up of Rojicek ridiculous.

116. On February 24, 2000, Repsholdt advised Rojicek that Smalley intended to fire her, and that Rojicek would have an opportunity to address the Board beforehand. Repsholdt also advised Rojicek to start documenting her accomplishments with the district immediately. Smalley's two requests to Repsholdt on February 22 and 24, 2000 were made while Smalley was vacationing with relatives in the Northwest.

117. Upon information and belief, Smalley issued a directive to terminate Rojicek on or after February 28, 2000 when she (Smalley) returned from her vacation, even though she was advised at that time that the search by Kellen and Repsholdt for payroll errors made by Rojicek had been futile.

118. On or about March 1, 2000, Smalley held a meeting in her office at which Repsholdt and Rojicek were present. Kellen arrived at the meeting later, shortly after being summoned by Smalley. Smalley summoned Kellen after Rojicek told her that Repsholdt had told Kellen that he would not commit perjury for Smalley in this matter. At the meeting, Smalley praised Rojicek's job skills and performance.

119. At the conclusion of the meeting in Smalley's office, Rojicek accused Smalley of being hostile towards her because of her pro-union activities. Smalley did not respond, but coolly dismissed Rojicek with a wave of her hand.

120. Smalley's open hostility towards Rojicek was apparent to Rojicek's co-workers, including Kathy Beck, Kellen's secretary.

121. On or about February 22, 2000, Kellen warned Rojicek that Smalley would retaliate against her if Rojicek was too truthful and for her pro-union activities if given the chance.

Kellen pointed out that Smalley had retaliated against him in the past when he had been too truthful with Smalley.

122. On or about March 3, 2000, Repsholdt wrote up Rojicek, but did not give her a copy. Upon information and belief, this write-up summarized their version of what was discussed during the meeting of Smalley, Repsholdt, Kellen and Rojicek.

123. On or around March 3, 2000, Smalley sent Repsholdt to NDI, a vendor of payroll processing, for a crash course in payroll processing. Upon information and belief, Repsholdt subsequently claimed that he convinced NDI to "take advantage of the market opportunities in the school district payroll processing area." Those "market opportunities" represent significant added expense to a school district in that outsourcing is invariably more expensive than hiring a competent employee to perform the job.

124. Upon information and belief, Smalley directed Repsholdt to come up with reasons that would convince the Board to outsource the payroll function. On March 7, 2000, District 26 voted to direct the administration to outsource the payroll function to NDI Solutions, Inc. Upon information and belief, no competitive bidding took place, and the Board approved the contract with NDI Solutions just two weeks later at its March 21, 2000 meeting.

125. Smalley, Kellen, Repsholdt and the Board conspired to cover up the termination of Rojicek by cloaking it in the guise of a reduction in force (RIF) because they were aware there was no legitimate reason, nor any legal basis, to terminate Rojicek.

126. Upon information and belief, District 26, Smalley, Repsholdt, Kellen and the Board intended to hide the firing of Rojicek in the usual round of spring RIFs. Rojicek could have been given a RIF notice at a later date because her job was a 12-month job not related to the school calendar. Had that been done, the District would have had ample time to insure a smooth conversion from in-house payroll processing to outsourcing, supporting the inference that outsourcing was not the real reason for eliminating Rojicek's position.

127. Upon information and belief, Smalley, Kellen, Repsholdt and the Board were acting on the advice of District 26's attorneys in engineering the RIF to terminate Rojicek.

128. No valid reason has ever been given by District 26 for outsourcing the payroll function. Rojicek was aware that any stated reason would be specious.

129. Rojicek was replaced by a independent contractor who, upon information and belief, charges the district $685 per day to do work that Rojicek did for considerably less compensation. Additionally, District 26 has incurred additional costs not covered by its payments to NDI. Rojicek estimates that she spent less than 50 percent of her time performing the tasks now performed by NDI. Upon information and belief, Defendant District 26 continues to employ said independent contractor to carry out Rojicek's duties. Upon information and belief, Defendant District 26 revised its daily contractual amount to an annual contractual amount of $55,000 since a daily rate charge was becoming exorbitant due to the problems caused by outsourcing.

130. Upon information and belief, Smalley and Repsholdt have both been responsible for the overseeing of the payroll function—Smalley at an approximate cost of $690 per day and Repsholdt at an approximate cost of $320 per day. The cost to the District of employing Rojicek to perform these duties was $136 per day.

131. Defendant William Wheatley stated that the board had decided to "decrease the number of educational support personnel." However, Rojicek's position was the only one administrative assistant position eliminated. Upon information and belief, Wheatley and the other defendants knew that Rojicek's position was the only one to be eliminated, and that no other administrative assistant position has ever been eliminated by District 26.

132. Rojicek's position as an administrative assistant was not subject to reduction in force because it was not dependent upon anticipated enrollment, as contrasted with teacher assistants with low seniority, whose positions are dependent upon prospective enrollment figures.

133. Furthermore, neither the RIF of newest-to-the-district teacher assistants nor Rojicek's termination were due to budgetary constraints. Not only was Rojicek's salary

budgeted for the coming year, but also there was nothing budgeted for the expense of outsourcing payroll for the coming year.

134.   As recently as September, 2000, Smalley has stated that District is financially sound and has surpluses in its Education Fund.  Additionally, a bond referendum passed prior to Rojicek's termination.

135.   In fact, the business office function at District 26 required additional personnel, not the elimination of a position.   Repsholdt had asked for the addition of at least another .5 person to the business office staff to handle the new duties the business office had assumed.

136.   "Personality conflicts" with Smalley are also not the reason for Rojicek's termination, because that reason would necessitate the termination of Kellen, Repsholdt and most of the District's employees.

137.   When Smalley threatened to eliminate Rojicek's position in June, 1998, Rojicek informed her that elimination of the payroll position through outsourcing was financially unsound and ridiculous.   Both Kellen and Repsholdt, who were present, concurred with Rojicek's view.

138.   Upon information and belief, the Board of District 26 knew of Rojicek's union activism when it terminated Rojicek's employment.

139.   Reduction in force is the method employed to terminate unnecessary personnel. Employees who receive RIF notices continue working until the end of the school year and the District pays for the employee's insurance until the beginning of the next school year.   RIFs are not preceded by meetings discussing work performance since RIFS are confidential until approved by the Board.  The employee is simply notified via a letter and after Board approval, that his/her position has been eliminated.  The employee is eligible for unemployment compensation.

140.   Firing for cause, which is never the result of a first infraction, is immediate. However, the employee receives 30 days' pay, and the District pays for the employee's insurance until the end of the month including the 30 days.  Firing for cause is preceded by warnings and

opportunities to correct the situation. A release from liability is prepared for the employee's signature, and the employee is eligible for unemployment compensation. Rojicek was not fired for cause. There were no warnings in her personnel file; only positive and glowing reviews. The extensive effort to find mistakes made by Rojicek turned up nothing, and employees were simply not fired for a single error.

141. The District may also fire an employee for moral turpitude if that employee has engaged in acts of depravity, breaches of confidentiality, financial fraud and other serious misconduct. Termination is immediate. The employee is paid only until the date of the misconduct or the date on which action is taken. Insurance coverage ends at the end of the month in which the employee is fired. The District prepares a release from liability for the employee's signature. The employee is not eligible for unemployment compensation, and any attempt to collect unemployment is contested by the District. Clearly, Rojicek was not fired for moral turpitude.

142. On March 9, 2000, Rojicek was advised that her position was being eliminated, effective April 7, 2000. Defendants eliminated Rojicek's position at a time when union negotiations were still going on.

143. Rojicek received less than a month's notice, was not allowed to work until the end of the school year, and the District did not pay for her insurance until the beginning of the next school year. Although the stated reason for the termination of Rojicek was a reduction in force due to the outsourcing of the payroll function, Defendant Kellen insisted upon escorting Rojicek from the building on March 9, 2000.

144. The Board of District 26 ratified the decision of Smalley, Kellen and Repsholdt to eliminate Rojicek's position and have the work performed by an outside consultant despite their knowledge that it would cost substantially more to pay an outside firm to perform the function.

145. At all times relevant hereto, Defendants were well aware that outsourcing was not a sound approach to payroll. Defendants ignored Rojicek's stated view that outsourcing payroll would be a mistake.

146.  In terminating the services of a gifted and valuable employee and replacing that employee with more costly and less efficient outsourcing, the Board, individually and collectively, violated the Code of Conduct recommended by the Illinois Association of School Boards which calls for fiscal responsibility in the development of sound business practices which insure that every dollar spent produces maximum results.

147.  Rojicek experienced severe anxiety and distress as a result of the harassment which Defendants subjected her to as a reprisal for her activities in organizing the union, culminating in the elimination of her job for no valid reason and the demeaning treatment to which they subjected her the day she was separated from employment with District 26.

148.  The facts surrounding Rojicek's termination clearly show that District 26, Smalley, Repsholdt, Kellen and the Board did not follow District 26's established policies in terminating Rojicek.  At all times relevant hereto, Defendants were aware that their termination of Rojicek violated the District policy.

149.  Similarly, the Board violated District policy and rules when the Board approved the payment of a retirement stipend to Smalley without requiring her to work for the District for ten years, the restriction applied to others before they could receive a retirement stipend.  Instead, the Board gave Smalley the expensive stipend after just four years with the District, and allowed her to keep it even though she did not retire when she told the Board she would.  The treatment of the Smalley retirement stipend by the Board further demonstrates that any Board claim of terminating Rojicek due to budgetary constraints is not credible.

150.  Accuracy and better service are also not credible reasons for the outsourcing decision.  Rojicek counted five errors in her last two paychecks under outsourcing.

## COUNT I:  INTENTIONAL INTERFERENCE WITH PLAINTIFF'S FIRST AMENDMENT FREE SPEECH RIGHTS UNDER COLOR OF LAW

1-150.  Plaintiff realleges, restates and incorporates Paragraphs 1 through 150 above as Paragraphs 1 through 150 of this Count I of Plaintiff's Complaint as if fully stated herein.

151.  Plaintiff's statements and conduct leading to the formation of the union for ESP employees of District 26 related to a matter of public concern.

152.  Specifically, Rojicek's speech invoked the fundamental right of employees to organize as protected by the National Labor Relations Act.   The ability of workers to organize without fear of reprisal or harassment is a matter of public concern.

153.  Plaintiff made these statements and engaged in these statements in a non-disruptive manner.

154.  As a result of Plaintiff's speech concerning the union, Defendants Smalley, Repsholdt and Kellen interfered with Plaintiff's First Amendment free speech rights by engaging in retaliatory conduct aimed at deterring Plaintiff from continuing to engage in speech directed at obtaining union representation for ESP employees of the District.

155.  Additionally, Defendant District 26 and Defendants Wheatley, Jenks, McCully, Cullen, Meyer, Engberg and Serbin, intentionally interfered with Plaintiff's First Amendment free speech rights by eliminating Rojicek's position as a reprisal for her speech connected with union representation for the ESP employees when no valid reason existed for said elimination.

156.  At all times relevant hereto, Defendants acted under color of law.

**WHEREFORE,** the Plaintiff respectfully prays that this Honorable Court enter judgment in her favor and against Defendants as to this Count I of this Complaint, awarding her any and all relief available under 42 U.S.C.§§ 1983 and 1988 to make her whole, including but not limited to, lost earnings and benefits, compensatory damages, attorneys' fees and costs, interest, and as to all Defendants except District 26, punitive damages.

### COUNT II: INTENTIONAL INTERFERENCE WITH PLAINTIFF'S FIRST AMENDMENT RIGHT OF ASSOCIATION UNDER COLOR OF LAW

1-150.  Plaintiff realleges, restates and incorporates Paragraphs 1 through 150 above as Paragraphs 1 through 150 of this Count II of Plaintiff's Complaint as if fully stated herein.

151.   Plaintiff sought the formation of a union so that she and her ESP co-workers could band together to obtain more favorable working conditions and compensation.

152.   Defendants intentionally interfered with her First Amendment right of association by eliminating her job without any valid reason when she actively worked to form the union.

153.   At all times relevant hereto, Defendants acted under color of law.

**WHEREFORE,** the Plaintiff respectfully prays that this Honorable Court enter judgment in her favor and against Defendants as to this Count II of this Complaint, awarding her any and all relief available under 42 U.S.C.§§ 1983 and 1988 to make her whole, including but not limited to, lost earnings and benefits, compensatory damages, attorneys' fees and costs, interest, and as to all Defendants except District 26, punitive damages.

## COUNT III: RETALIATORY DISCHARGE

1-150.   Plaintiff realleges, restates and incorporates Paragraphs 1 through 150 above as Paragraphs 1 through 150 of this Count III of Plaintiff's Complaint as if fully stated herein.

151.   Plaintiff actively participated in and supported the formation of a union to represent ESP employees of Defendant District 26.

152.   The right to organize and form a union is protected by federal labor law, specifically the National Labor Relations Act.

153.   The right to organize and form a union is a clearly mandated public policy which affects the rights of Illinois citizens.

154.   Defendants' termination of Plaintiff violates the clearly mandated public policy protecting the right of Illinois citizens to organize and to seek union representation.

**WHEREFORE,** the Plaintiff respectfully prays that this Honorable Court enter judgment in her favor and against Defendants as to this Count III of this Complaint, awarding her any and all relief necessary to make her whole, including but not limited to, lost earnings and benefits, compensatory damages, interest, and as to all Defendants except District 26, punitive damages.

## COUNT IV: INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

1-150.   Plaintiff realleges, restates and incorporates Paragraphs 1 through 150 above as Paragraphs 1 through 150 of this Count IV of Plaintiff's Complaint as if fully stated herein.

151.    To punish Plaintiff for actively working to form a union for ESP employees of District 26, Defendant Smalley engaged in harassing behavior, which included treating Rojicek with extreme hostility and coldness; threatening her with the loss of her job, and disciplining her for invalid reasons.

152.   Such behavior was unwarranted under the circumstances.

153.   Defendants District 26 and its board members, aware of Smalley's predilection for unreasonable and harassing behavior, allowed her carte blanche to subject Rojicek to such treatment.

154.   Defendant Repsholdt assisted Smalley in her unreasonable and distressing treatment of Rojicek.

155.   Defendants, especially Smalley, intended to inflict extreme emotional distress upon Rojicek to punish her for her union organizing activities and for protesting the harsh and unjust compensation structure visited upon the ESP employees by Smalley and District 26.

156.   The behavior of Defendants did indeed subject Rojicek to severe humiliation, distress, mental anguish and worry over her financial future when she lost the job which she was performing in an expert manner.

**WHEREFORE,** the Plaintiff respectfully prays that this Honorable Court enter judgment in her favor and against Defendants as to this Count IV of this Complaint, awarding her any and all relief necessary to make her whole, including but not limited to, lost earnings and benefits, compensatory damages, interest, and as to all Defendants except District 26, punitive damages.

Respectfully submitted,
Marlene Rojicek, Plaintiff

By One of Her Attorneys

Claudia Oney
Claudia Oney & Associates
130 East Randolph, Suite 1200
Chicago, IL 60601
312/782-1900

Patricia Rummer
Law Offices of Patricia Rummer
5950 East Lincoln Avenue, Suite 500
Lisle, IL 60532
630/852-8393

JS 44
(Rev. 12/96)

# CIVIL COVER SHEET

The JS-44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. (SEE INSTRUCTIONS ON THE REVERSE OF THE FORM.)

**I. (a) PLAINTIFFS**

Marlene Rojicek

**DEFENDANTS** River Trails School Dist. 26
Shirley Smalley; Donald Kellen; John
Repsholdt; William J. Wheatley; Alice
Jenkes; Nancy McCully; James Cullen;
Alvin Engberg; James ____; Donald Serbin

**(b)** COUNTY OF RESIDENCE OF FIRST LISTED PLAINTIFF   Cook
(EXCEPT IN U.S. PLAINTIFF CASES)

DOCKETED

FEB - 5 2001

COUNTY OF RESIDENCE OF FIRST LISTED DEFENDANT   Cook
(IN U.S. PLAINTIFF CASES ONLY)

NOTE:   IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE
TRACT OF LAND INVOLVED

**(c)** ATTORNEYS (FIRM NAME, ADDRESS, AND TELEPHONE NUMBER)
Law Offices of Patricia Rummer
5950-E Lincoln Avenue, Suite 300
Lisle, IL 60532-3104
630/852-8393

ATTORNEYS (IF KNOWN)
not known

01C 0723
JUDGE ZAGEL

MAGISTRATE JUDGE DENLOW

## II. BASIS OF JURISDICTION (PLACE AN "X" IN ONE BOX ONLY)

☐ 1 U.S. Government
Plaintiff

☒ 3 Federal Question
(U.S. Government Not a Party)

☐ 2 U.S. Government
Defendant

☐ 4 Diversity
(Indicate Citizenship of Parties
in Item III)

## III. CITIZENSHIP OF PRINCIPAL PARTIES (PLACE AN "X" IN ONE BOX FOR PLAINTIFF
(For Diversity Cases Only)                                      AND ONE BOX FOR DEFENDANT)

|  | PTF | DEF |  | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated or Principal Place of Business In This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated and Principal Place of Business In Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. ORIGIN (PLACE AN "X" IN ONE BOX ONLY)

☒ 1 Original
Proceeding

☐ 2 Removed from
State Court

☐ 3 Remanded from
Appellate Court

☐ 4 Reinstated or
Reopened

☐ 5 Transferred from
another district
(specify)

☐ 6 Multidistrict
Litigation

☐ 7 Appeal to District
Judge from
Magistrate
Judgment

## V. NATURE OF SUIT (PLACE AN "X" IN ONE BOX ONLY)

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | ☐ 610 Agriculture | ☐ 422 Appeal 28 USC 158 | ☐ 400 State Reapportionment |
| ☐ 120 Marine | ☐ 310 Airplane | ☐ 362 Personal Injury — | ☐ 620 Other Food & Drug | | ☐ 410 Antitrust |
| ☐ 130 Miller Act | ☐ 315 Airplane Product | Med. Malpractice | ☐ 625 Drug Related Seizure | ☐ 423 Withdrawal | ☐ 430 Banks and Banking |
| ☐ 140 Negotiable Instrument | Liability | ☐ 365 Personal Injury — | of Property 21 USC 881 | 28 USC 157 | ☐ 450 Commerce/ICC Rates/etc. |
| ☐ 150 Recovery of Overpayment | ☐ 320 Assault, Libel & | Product Liability | ☐ 630 Liquor Laws | | ☐ 460 Deportation |
| & Enforcement of Judgment | Slander | ☐ 368 Asbestos Personal | ☐ 640 R.R. & Truck | **PROPERTY RIGHTS** | ☐ 470 Racketeer Influenced and |
| ☐ 151 Medicare Act | ☐ 330 Federal Employers' | Injury Product Liability | ☐ 650 Airline Regs. | ☐ 820 Copyrights | Corrupt Organizations |
| ☐ 152 Recovery of Defaulted | Liability | | ☐ 660 Occupational | ☐ 830 Patent | ☐ 810 Selective Service |
| Student Loans | ☐ 340 Marine | **PERSONAL PROPERTY** | Safety/Health | ☐ 840 Trademark | ☐ 850 Securities/Commodities/ |
| (Excl. Veterans) | ☐ 345 Marine Product | ☐ 370 Other Fraud | ☐ 690 Other | | Exchange |
| ☐ 153 Recovery of Overpayment | Liability | ☐ 371 Truth in Lending | | | ☐ 875 Customer Challenge |
| of Veteran's Benefits | ☐ 350 Motor Vehicle | ☐ 380 Other Personal | **LABOR** | **SOCIAL SECURITY** | 12 USC 3410 |
| ☐ 160 Stockholders' Suits | ☐ 355 Motor Vehicle | Property Damage | ☐ 710 Fair Labor Standards | ☐ 861 HIA (1395ff) | ☐ 891 Agricultural Acts |
| ☐ 190 Other Contract | Product Liability | ☐ 385 Property Damage | Act | ☐ 862 Black Lung (923) | ☐ 892 Economic Stabilization Act |
| ☐ 195 Contract Product Liability | ☐ 360 Other Personal Injury | Product Liability | ☐ 720 Labor/Mgmt. Relations | ☐ 863 DIWC/DIWW (405(g)) | ☐ 893 Environmental Matters |
| | | | | ☐ 864 SSID Title XVI | ☐ 894 Energy Allocation Act |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | ☐ 730 Labor/Mgmt. Reporting | ☐ 865 RSI (405(g)) | ☐ 895 Freedom of |
| ☐ 210 Land Condemnation | ☐ 441 Voting | ☐ 510 Motions to Vacate | & Disclosure Act | | Information Act |
| ☐ 220 Foreclosure | ☒ 442 Employment | Sentence | ☐ 740 Railway Labor Act | **FEDERAL TAX SUITS** | ☐ 900 Appeal of Fee Determination |
| ☐ 230 Rent Lease & Ejectment | ☐ 443 Housing/ | **HABEAS CORPUS:** | | ☐ 870 Taxes (U.S. Plaintiff | Under Equal Access to Justice |
| ☐ 240 Torts to Land | Accommodations | ☐ 530 General | ☐ 790 Other Labor Litigation | or Defendant) | ☐ 950 Constitutionality of |
| ☐ 245 Tort Product Liability | ☐ 444 Welfare | ☐ 535 Death Penalty | | ☐ 871 IRS — Third Party | State Statutes |
| ☐ 290 All Other Real Property | ☐ 440 Other Civil Rights | ☐ 540 Mandamus & Other | ☐ 791 Empl. Ret. Inc. | 26 USC 7609 | ☐ 890 Other Statutory Actions |
| | | ☐ 550 Civil Rights | Security Act | | |
| | | ☐ 555 Prison Condition | | | |

## VI. CAUSE OF ACTION (CITE THE U.S. CIVIL STATUTE UNDER WHICH YOU ARE FILING AND WRITE BRIEF STATEMENT OF CAUSE.
DO NOT CITE JURISDICTIONAL STATUTES UNLESS DIVERSITY.)

42 USC 1983, 42 USC 1985: intentional deprivation of plaintiff's
free speech rights under color of law; conspiracy

## VII. REQUESTED IN
COMPLAINT

CHECK IF THIS IS A **CLASS ACTION**
☐ UNDER F.R.C.P. 23

DEMAND $

CHECK YES only if demanded in complaint
JURY DEMAND:   ☒ YES   ☐ NO

## VIII.   This case
☒ is not a refiling of a previously dismissed action.
☐ is a refiling of case number _____, previously dismissed by Judge _____

DATE
2-2-01

SIGNATURE OF ATTORNEY OF RECORD
Patricia K. Rummer

UNITED STATES DISTRICT COURT

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS

In the Matter of

*Marlene Rojicek, Plaintiff,*
*v.*
*River Trails School District 26*
*et al., Defendants*

Case Number: **01C 0723**

JUDGE ZAGEL

APPEARANCES ARE HEREBY FILED BY THE UNDERSIGNED AS ATTORNEY(S) FOR:

*Plaintiff, Marlene Rojicek*

MAGISTRATE JUDGE DENLOW

---

**DOCKETED** FEB - 5 2001

FILED-ED4 01FEB -2 AM 10: 13 CLERK U.S. DISTRICT COURT

| (A) | (B) |
|---|---|
| SIGNATURE *Patricia Rummer* | SIGNATURE |
| NAME *Patricia K. Rummer* | NAME |
| FIRM *Law Offices of Patricia Rummer* | FIRM |
| STREET ADDRESS *5950-E Lincoln Avenue* | STREET ADDRESS |
| CITY/STATE/ZIP *Lisle, IL 60532-3104* | CITY/STATE/ZIP |
| TELEPHONE NUMBER *630/852-8393* | TELEPHONE NUMBER |
| IDENTIFICATION NUMBER (SEE ITEM 4 ON REVERSE) *06220436* | IDENTIFICATION NUMBER (SEE ITEM 4 ON REVERSE) |
| MEMBER OF TRIAL BAR?   YES ☒   NO ☐ | MEMBER OF TRIAL BAR?   YES ☐   NO ☐ |
| TRIAL ATTORNEY?   YES ☒   NO ☐ | TRIAL ATTORNEY?   YES ☐   NO ☐ |
|  | DESIGNATED AS LOCAL COUNSEL?   YES ☐   NO ☐ |

| (C) | (D) |
|---|---|
| SIGNATURE | SIGNATURE |
| NAME | NAME |
| FIRM | FIRM |
| STREET ADDRESS | STREET ADDRESS |
| CITY/STATE/ZIP | CITY/STATE/ZIP |
| TELEPHONE NUMBER | TELEPHONE NUMBER |
| IDENTIFICATION NUMBER (SEE ITEM 4 ON REVERSE) | IDENTIFICATION NUMBER (SEE ITEM 4 ON REVERSE) |
| MEMBER OF TRIAL BAR?   YES ☐   NO ☐ | MEMBER OF TRIAL BAR?   YES ☐   NO ☐ |
| TRIAL ATTORNEY?   YES ☐   NO ☐ | TRIAL ATTORNEY?   YES ☐   NO ☐ |
| DESIGNATED AS LOCAL COUNSEL?   YES ☐   NO ☐ | DESIGNATED AS LOCAL COUNSEL?   YES ☐   NO ☐ |

